UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

APACE COMMUNICATIONS, LTD., et al.,

                                        Plaintiffs,

                                                                                             DECISION AND ORDER

                                                                                             07-CV-6151L

                        v.

JEFFREY BURKE, et al.,

                                        Defendants.
_____


**INTRODUCTION**

Plaintiff Apace Communications, Ltd. ("Apace") brought this action asserting fraud and other claims against a number of defendants, alleging that Apace was fraudulently induced by defendants to invest in a company named NetSetGo.

The Court has issued several decisions in this case, granting plaintiff leave to amend the complaint, 522 F.Supp. 509 (W.D.N.Y. 2007), granting leave to file a second amended complaint, 584 F.Supp.2d 591 (W.D.N.Y. 2008), and dismissing plaintiff's claims against a particular defendant, David Klein. 2009 WL 1748711 (W.D.N.Y. June 19, 2009). Several of the remaining defendants--Steven and Lori Levine ("Levines") (Dkt. #168) and Clint Campbell, Cephas Capital

Partners, LP, and Jeffrey Holmes ("Cephas defendants") (Dkt. #173), have now moved for summary judgment.

The underlying facts of this case have been set forth in the Court's prior decisions, particularly the 2007 decision granting leave to amend, 522 F.Supp.2d at 512-13. The gist of plaintiff's claim is that Apace, acting mostly through one of its principals, Rakesh Aggarwal, was fraudulently induced by defendants to invest millions of dollars in NetSetGo, an internet service provider, and that Apace lost its investment as a result of that fraud.

The Levines and the Cephas defendants were secured creditors of NetSetGo. They, together with the other defendants, allegedly led Aggarwal to believe that NetSetGo's financial condition and outlook were in far better shape than they were. Defendants allegedly convinced Aggarwal that an infusion of cash was all that NetSetGo needed to yield significant profits down the road. Plaintiff alleges that defendants' true purpose in inducing Apace to make further "investments" was not to strengthen NetSetGo, but to recoup their own investments, at Apace's expense.

Plaintiff alleges that on behalf of Apace, and based on assurances and enticements made to Apace by defendants, Aggarwal, for a while, continued to sink Apace's money into NetSetGo. In March 2002–by which time Aggarwal had become the chairman of the board of Apace, Aggarwal Deposition Transcript ("Tr.") (Dkt. #168 Ex. C) at 448-50–Apace agreed to lend NetSetGo $2.5 million, under a "Bridge Line of Credit Agreement," Dkt. #236-10, and Aggarwal, on behalf of Apace, agreed that Apace's security interest created by that loan would be subordinate to that of Cephas Capital Partners.

At some point, Aggarwal, apparently coming to believe that he was throwing good money after bad, refused to invest more money in NetSetGo. NetSetGo never did become profitable, and its assets were sold at a UCC Article 9 foreclosure sale in December 2002 and bought by defendant Cephire Corp., a company that had been formed by defendants for the purpose of acquiring NetSetGo's assets. Apace sent an "observer" to the sale, and could have but did not bid on NetSetGo's assets. Plaintiff claims that the sale was not conducted in good faith and was fraudulent, and that Apace lost virtually its entire investment.

Plaintiff also alleges, as explained in more detail below, that defendants led it to believe that if Apace invested in NetSetGo, NetSetGo would engage in substantial business with Cresco Technologies, a sister company of Apace. Plaintiff alleges that NetSetGo never did business with Cresco, and that defendants never intended that it would; those alleged promises, plaintiff alleges, were intended only to induce Apace to invest in NetSetGo.

The second amended complaint ("SAC") asserts eight causes of action: (1) fraud; (2) constructive fraud; (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) conspiracy to commit fraud; (6) agency; (7) fraudulent conveyance; and (8) successor liability. Plaintiff seeks $8 million in damages.

## DISCUSSION

The fundamental basis for plaintiff's claims is a theory of fraud. To make out a fraud claim, plaintiff must allege and prove "a material misrepresentation of an existing fact, made with

knowledge of the falsity, an intent to induce reliance thereon, justifiable reliance upon the misrepresentation, and damages." *McMorrow v. Angelopoulos*, 113 A.D.3d 736, 739-40 (2d Dep't 2014)); *see Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d 976). Judging plaintiff's claims against that standard, plaintiff's claims fail.

**I. Cephas Defendants**

Aggarwal's deposition testimony shows that he became interested in investing in NetSetGo based on the recommendation of "one of [his] close friends, Dr. Chellappa." Tr. at 67. *See also* Plaintiff's Response to Cephas Defendants' Statement of Material Facts (Dkt. #236-1) ¶ 14 (describing Chellappa as a "good friend of Aggarwal"). Chellappa (who is not a party to this action), whom Aggarwal considered to be "an 'insider,' a shareholder, and director of NETSETGO" who "had firsthand knowledge of NETSETGO," Dkt. #236-1 ¶ 17, advised Aggarwal that NetSetGo "was a good company with a good track record, excellent management, technology, customers and honorable people behind it who honored their obligations." *Id.* at 106, 107.[1]

Prior to deciding whether to invest in NetSetGo, Aggarwal (who has extensive business experience, *see id.* at 29-44), was cautioned by NetSetGo, in a written offering document, that any

---

[1] With respect to Aggarwal's belief in February 2001 that Chellappa was "an 'insider,' a shareholder, and director of NETSETGO" with "firsthand knowledge of NETSETGO," Apace now contends that "except for the fact that Chellappa had firsthand knowledge of NETSETGO, this understanding was not correct." Dkt. #236-1 ¶ 17. But Apace agrees that Aggarwal believed those things about Chellappa in February 2001. Apace further states that "Chellappa had the capacity to give Aggarwal immense knowledge about the business of NETSETGO," *id.*, by virtue of NETSETGO's prior purchase of a company owned by Chellappa. This was also not the first time that Aggarwal had made an investment decision based on the advice of Chellappa. *Id.* If Aggarwal relied on anyone, then, in deciding whether to invest in NetSetGo, it was Chellappa.

- 4 -

investment in the company would carry a "high degree of risk." *Id.* at 382. Aggarwal ultimately decided, nonetheless, to invest $500,000 in NetSetGo, without reviewing any of NetSetGo's financial data. He mostly relied on Chellappa's advice. *Id.* at 108. He "did not engage anyone else" to look into whether NetSetGo was a wise investment. *Id.*

Aggarwal subsequently decided to invest millions of dollars more in NetSetGo. But the record demonstrates that he did not do so based on any misrepresentations by the Cephas defendants.

In fact, the record is clear that Aggarwal was in possession of substantial information about NetSetGo's financial situation, and that he could have, but did not, obtain more such information. Following Apace's initial $500,000 investment, NetSetGo provided Aggarwal and Apace with NetSetGo's consolidated financial statements for 1999 and 2000. Those statements showed quite plainly that NetSetGo had lost millions of dollars and was over $20 million in debt. *See* SAC Ex. A; Tr. at 164.

Nevertheless, in 2001, Aggarwal decided to invest a further $5 million in NetSetGo, in exchange for sixty percent of its stock. Aggarwal testified that he made that decision based in part on statements made to him by defendant Jeffrey Burke about an alleged merger proposal that would have substantially increased the value of NetSetGo. Tr. at 138. When asked whether he undertook any investigation into whether $5 million was a fair price for sixty percent of NetSetGo, Aggarwal replied, "At the time, no." Tr. at 139.

Aggarwal went on to say that Chellappa had put him in touch with Burke and another defendant, David Klein, both of whom Chellappa had described to him as a "very good management

team, very strong people who always honored their obligations ... ." Tr. at 141.[2]  Aggarwal testified that he "trusted Mr. Burke and Mr. Klein and accepted the offer they had made." *Id.*  He also repeated that Chellappa "was the one who encouraged us to invest in NetSetGo." Tr. at 330.

All of this occurred weeks *before* Aggarwal's first meeting with the Cephas defendants on May 13, 2001. *See* Tr. at 262.  Thus, Aggarwal could not possibly have relied on any statements by the Cephas defendants when he made his initial $500,000 investment in March 2001, or his $5 million investment on April 26, 2001.

Aggarwal's recitation of what transpired at the May13 meeting also fails to show any statements by the Cephas defendants that could provide the basis for a fraud claim.  He testified that Campbell and Holmes "reaffirmed everything we had heard from Mr. Burke; that NetSetGo was a strong company, had [a] good track record, had done well in 2000 and its prospects were looking good ... ." Tr. at 264.  Campbell allegedly also stated that he and Holmes "were impressed by the high quality of the NetSetGo officers, including Burke and Klein." SAC ¶ 39.  In short, Aggarwal testified to nothing more than general, optimistic statements, which amount to nothing more than non-actionable "puffery." *See*, *e.g.*, *Nadoff v. Duane Reade, Inc.*, 107 Fed.Appx. 250, 252-53 (2d Cir. 2004); *In re Nevsun Resources Ltd.*, No. 12 CIV. 1845, 2013 WL 6017402, at *8 (S.D.N.Y. Sept. 27, 2013).

And again, Aggarwal's own testimony shows that he did not rely on the Cephas defendants' statements when he made his investment decisions.  In fact, based on what he knew, or thought he knew in April 2001, he declined to undertake any detailed investigation into NetSetGo's finances.

---

[2]The claims against Klein have been dismissed for lack of subject matter jurisdiction. *See* 2009 WL 1748711 (W.D.N.Y. June 19, 2009).

At his deposition, Aggarwal testified that when he made his $5 million investment decision in April 2001, he did not consider it necessary to conduct any due diligence investigation. Tr. at 339. He did, however, agree that he could see, before making that investment decision, that NetSetGo's "financials [we]re not in the pink of health." Tr. at 332. He was well aware that "[i]ts accounts payable far exceeded its accounts receivables, and therefore, some actions need[ed] to be taken urgently to bring the company back into sound financial footing." *Id.*

Clearly, Aggarwal ultimately decided that despite these warning signs, NetSetGo represented a worthwhile investment. But he has not demonstrated that he reached that conclusion based on any actionable misrepresentations by the Cephas defendants.

Aggarwal also knew that Cephas was a creditor of NetSetGo. He knew that NetSetGo owed Cephas money, by virtue of a prior loan made to NetSetGo by Cephas, but he did not bother to ascertain the terms of that loan. According to Aggarwal, "[t]hat did not come [up] in our discussions." Tr. at 265.

It also bears repeating that Aggarwal was no babe in the woods, where business and investments were concerned. He testified at some length during his deposition about his extensive business background. *See* Tr. at 29-44. This includes an MBA degree and fifteen years at Citibank, where he was involved in reviewing credit applications for loans up to $25 million. Tr. at 29, 32. He also was an officer for several years of Union Bank of Switzerland, and had personal investment experience as well. Tr. at 39-46. With another individual, Aggarwal founded Apace in the British Virgin Islands, choosing that location in part based on certain tax advantages enjoyed by companies there. Tr. at 22-24.

Yet as noted, when it came to the decision whether to invest in NetSetGo, Aggarwal failed to undertake a thorough investigation of NetSetGo's finances, despite red flags of which he was well aware. *See APA Excelsior III L.P. v. Premiere Technologies, Inc.*, 476 F.3d 1261, 1264 (11th Cir. 2007) (noting that "Plaintiffs were sophisticated investors with due diligence rights, but they failed to exercise them in any meaningful way," aside from a "superficial due diligence"); *Holdsworth v. Strong*, 545 F.2d 687, 692 (10th Cir. 1976) ("Where the due diligence standard is applied it requires insiders or sophisticated investors who have access to information to take positive steps to ascertain the facts for themselves").

For that matter, the Stock Purchase Agreement ("SPA") itself (SAC Ex. H) expressly stated that Apace "ha[d] sufficient knowledge and experience in making investments so as to be able to evaluate the risks and merits of its investment ... ."[3] *See* SPA § 3.4. It also stated in Article XVI that all the parties to the agreement completely understood its terms, that each party was relying solely on its own judgment in executing the agreement, that the agreement was the result of arm's-length negotiations, and that each party had the opportunity to seek advice of counsel. Aggarwal testified at his deposition that he had retained counsel prior to entering into the SPA, and that although Aggarwal had not asked him to do so (because he considered it unnecessary, *see* Tr. at 339), his attorney did conduct due diligence on Apace's behalf. Tr. at 337-38.

Plaintiff's claims for constructive fraud and negligent misrepresentation also fail due to the absence of any fiduciary or other special relationship between Apace and the Cephas defendants.

---

[3] The SPA was executed in July 2001, but it essentially memorialized the parties' April agreement whereby Apace agreed to purchase 60% of NetSetGo's stock for $5 million. Aggarwal testified that as far as he was concerned, by the time he signed the SPA, "a deal ha[d] already been closed" based on that earlier agreement. Tr. at 338-39.

The Cephas defendants were secured creditors of NetSetGo, and Apace was an investor in NetSetGo. Nothing about those conventional business relationships gave rise to any fiduciary duties on the part of the Cephas defendants toward Apace. *See Wilson v. Dantas*, ___ F.3d ___, 2014 WL 866507, at *3 (2d Cir. 2014) ("In the absence of mutual intent on the part of [plaintiff] Wilson and the Citibank defendants to create a fiduciary relationship, any reliance or trust Wilson unilaterally placed in the Citibank defendants was insufficient to create a fiduciary relationship"); *FLB, LLC v. Cellco Partnership*, 536 Fed.Appx. 132, 134 (2d Cir. 2013) (fiduciary relationship is an element of constructive fraud and negligent misrepresentation) (citing *Klembczyk v. Di Nardo*, 265 A.D.2d 934 (4th Dep't 1999), and *Hydro Investors, Inc., v. Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000)).

  Plaintiff contends that the Cephas defendants are liable under the alter-ego doctrine because they treated NetSetGo as their instrumentality. "Alter ego liability exists when a parent or owner uses the corporate form 'to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own.'" *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 195 (2d Cir. 2010) (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (applying New York law)), *aff'd*, ___ U.S. ___, 133 S.Ct. 1659 (2013).

  This assertion is based on speculation and naked allegations. Plaintiff recites various communications the parties had with each other, but they fail to support his blanket contention that "Cephas controlled every major aspect of NetSetGo's dealings with Aggarwal and Apace ... ." Plaintiff's Mem. (Dkt. #236) at 47. That the Cephas defendants were involved in some of the

parties' negotiations is unremarkable, since they were secured creditors of NetSetGo. But none of these communications and dealings support plaintiff's claim that NetSetGo "had no existence separate from the Levines and Cephas." *Id.* at 47. In any event, the fact remains that plaintiff either ignored, or chose not to look into, the facts concerning NetSetGo's financial situation.

As noted earlier, in July 2001, Aggarwal was elected chairman of the board of Apace. Aggarwal Tr. at 448-50. At that point, Apace held sixty percent of NetSetGo's stock. There can hardly be any doubt, then, that at that point, Aggarwal and Apace had complete access to all of NetSetGo's financial information. And yet it was after that date that plaintiff decided to loan an additional $2.5 million to NetSetGo. That decision, no matter how unwise in hindsight, cannot be blamed on the Cephas defendants (or the Levines).

There is also a lack of evidence to support plaintiff's contention that the Cephas defendants wrongfully induced, or conspired to induce, Apace to enter into the 2002 subordination agreement, by which Apace agreed that its security interest created by its loan of $2.5 million to NetSetGo would be subordinate to the interest of Cephas Capital Partners. Aggarwal testified that Klein called him and told him that he needed to sign the agreement, so that NetSetGo could issue a "rights offering to NETSETGO employees and shareholders." Dkt. #103 ¶ 74. But Aggarwal testified that he "presume[d]" that Klein "was being pressured by Cephas and [the] Levines to get this task completed." Tr. at 515. He has offered no evidence, apart from this supposition, that the Cephas defendants did anything to persuade him to sign the subordination agreement, or that defendants prevented him from being fully aware of all the relevant facts at the time that he signed the agreement. The subordination agreement itself (Dkt. #104-4) contains a merger clause stating that

it "contains the entire agreement of the parties," very clearly releases any defenses not spelled out in the agreement itself.

Plaintiff's claims of fraudulent conveyance and successor liability, which arise out of the foreclosure sale of NetSetGo's assets in December 2002, also fail. Defendants have submitted proof that the sale was conducted in a commercially reasonable manner. The sale was publicly advertised, and notice was given to Apace.[4] Apace was not only aware of the sale, but Aggarwal's brother, Naresh Aggarwal, attended the sale. He did not place a bid because Apace did not want to "ratify" the sale. Tr. at 624-29.

There is simply no evidence that Apace was excluded from the process that led to the foreclosure sale, or that the sale amounted to a sham. If Apace truly believed that defendants were buying NetSetGo's assets at bargain-basement prices, Apace was free to enter its own bid. It chose not to.

Apace also alleges that certain assets were improperly included in the sale, because they belonged not to NetSetGo, but to Netrica, a subsidiary of NetSetGo. *See* Dkt. #236 at 27. But again, Apace did not raise any objection to the sale on that ground, at the time of the sale. Furthermore, even assuming that the inclusion of Netrica's assets was improper, I fail to see how Apace has standing to challenge that inclusion, since it has not submitted any proof that it is a creditor of Netrica. In any event, the evidence here establishes that NetSetGo and Netrica were operated as a

---

[4]At his deposition, Aggarwal described the Rochester Democrat and Chronicle, in which the notice of the sale was published, as "[t]he least circulated newspaper in the Rochester area ...," although he admitted that he had no personal knowledge in that regard. Aggarwal Tr. (Dkt. #168-3) at 630. In fact, the Democrat and Chronicle is the Rochester area's only daily newspapers, with a reported circulation in January 2013 of over 105,000. *See* http://rocwiki.org/Democrat_%26_Chronicle

single entity, so that there was in fact no impropriety in including Netrica's assets in the UCC sale. *See* Benedict Depo. at 385, 409; Burke Depo. at 709, 716; Dewey Depo. at 33-34, 56.

**II. Levines' Motion**

Many of the reasons given for dismissing plaintiff's claims against the Cephas defendants also apply to its claims against the Levines. The evidence shows that the Levines were minority shareholders and secured creditors of NetSetGo, and that they never spoke to Aggarwal or made any specific misrepresentations regarding NetSetGo, prior to any of Apace's investments in NetSetGo. Plaintiff first spoke with the Levines in the summer of 2002, to discuss the status of their loans to NetSetGo, and there is no evidence that they made any material misrepresentations during that meeting. In addition, by that time, Apace had already invested $5.5 million in NetSetGo, and had entered into the $2.5 million "Bridge Line of Credit Agreement" in March 2002. Dkt. #236-10.

This is not to suggest that the Levines can only be liable for misrepresentations they made during face-to-face meetings with Aggarwal. But plaintiff simply alleges, without evidentiary support, that the Levines were a part of a conspiracy to milk Apace for the benefit of defendants. Those broad allegations are not supported by specific facts, and are insufficient to defeat a motion for summary judgment.

Plaintiff has identified certain documents that allegedly show that the Levines made false representations in connection with certain meetings that took place in October and November 2002, *see* Dkt. #237 at 5, but these documents do not contain any statements by the Levines. Plaintiff ascribes the statements in those documents to the Levines, based on its allegation that the Levines

conspired with the other defendants and actors to defraud plaintiff. But that conspiracy allegation rests in large part on those very documents. Such circular reasoning cannot create a genuine issue of material fact.

Much of plaintiff's claim against the Levines is based on generalized allegations that the Levines conspired with the other defendants, and that the various defendants acted as agents of each other. Plaintiff's attempt to link the defendants together, under any of these theories, ultimately rests on the allegation that the defendants acted in concert, either through a grant of authority to one another or as part of an overall scheme. But under any theory, plaintiff's claims against the Levines are not supported by the facts. Speculation and conjecture are not enough at this stage of the case.

Actual authority, whether express or implied, exists when an agent has the power "to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestation to him.'" *Minskoff v. American Exp. Travel Related Servs. Co.*, 98 F3d 703, 708 (1996). Apparent authority exists when "words or conduct of the principal, communicated to a third party, ... give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Hallock v. State of New York*, 64 N.Y.2d 224, 231-32 (1984).

To prevail on a claim of civil conspiracy, a plaintiff must allege and prove the underlying tort, plus four additional elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *Fisk v. Letterman*, 424 F.Supp.2d 670, 677 (S.D.N.Y. 2006).

The first problem with the conspiracy claim is that plaintiff has not presented sufficient evidence to prevail on his underlying fraud claim, as explained above. "Conspiracy" is not recognized as an independent tort in New York. *Kickertz v. New York Univ.*, 110 A.D.3d 268, 281 (1st Dep't 2013). Apace has not shown that the Levines did anything that would constitute fraud as to Apace.

Apace has also failed to show that the Levines granted either actual or apparent authority to the other defendants, with respect to the matters that form the basis of plaintiff's claims. The evidence does not support a finding that the Levines granted any other actors authority to act on their behalf, or that they gave Apace reason to think that anyone else had been empowered to act on their behalf, at any time prior to Apace's investments in NetSetGo.

Nor does the evidence support a finding that the Levines (who owned about 2.5% of NetSetGo's stock) controlled NetSetGo. As with the Cephas defendants, the Levines, as secured creditors of NetSetGo, took part in some discussions with NetSetGo's principals, and they exercised their rights to enforce their security interests through an Article 9 sale. None of that shows that the other defendants, or anyone in a position of authority at NetSetGo, was acting under the Levines' control or direction.

Plaintiff's other allegations against the Levines are likewise devoid of evidentiary support. Plaintiff alleges, for instance, that the Levines never intended that NetSetGo would do business with Cresco, and that they and the other defendants deliberately "deprived Cresco of any NETSETGO business to ensure that they could continue their control over NETSETGO ... ." SAC ¶ 40. Plaintiff has not demonstrated how allowing NetSetGo to do business with Cresco would have weakened the

Levines' supposed control over NetSetGo, or otherwise given the Levines some unfair advantage over Apace, but in any event this assertion is not supported by the evidence.

Plaintiff has alleged that the Levines had no right to force a foreclosure sale of NetSetGo's assets, because the Levines had reached an agreement with NetSetGo by which NetSetGo agreed to provide "in kind" computer services to the Levines, in lieu of interest payments on the Levines' note. Thus, according to plaintiff, NetSetGo was not in default on the note by which the Levines had loaned money to NetSetGo. Plaintiff alleges that the Levines, in concert with the Cephas defendants, falsely depicted themselves and Cephas as the only secured creditors of NetSetGo, when in fact Apace was also a secured creditor.

The Levines' note itself, however, stated that it could only be amended in writing, and there was no writing providing that NetSetGo could meet any of its obligations to the Levines by providing "in kind" services. *See* Levines' Ex. J at 3; N.Y. Gen. Obl. L. § 15-301(1) ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent").

Aside from that, plaintiff admits that it was aware of the alleged in-kind agreement prior to the UCC sale. Plaintiff states that in September 2002, Aggarwal, having been made aware of the in-kind agreement, met with Steven Levine, and that Levine "acknowledged that NETSETGO had performed computer services for Empire Beef, at no cost, in place of interest payments on the Levines' note." Plaintiff's Response to the Levines' Motion (Dkt. #237) at 6. Thus, this agreement

could not have induced any reliance on the part of Apace, and if Apace believed that the sale itself was somehow improper, it could have challenged it, either in its capacity as a secured creditor or as the majority shareholder of NetSetGo. It failed to do so. *See Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 644 (Tenn.Ct.App. 2008) (noting that debtor had an opportunity to object to the sale of collateral but did not do so); *see also In re Winer*, 39 B.R. 504, 509 (Bankr. S.D.N.Y. 1984) (recognizing right to challenge an Article 9 sale).

As stated, Aggarwal's brother Naresh attended the UCC sale as an "observer" for Apace. Aggarwal Tr. (Dkt. #168-3) at 624. At his deposition, Aggarwal did not deny that Apace could have placed a bid at the sale, but he indicated that Apace did not want to be seen as "ratifying the process ... ." *Id.* He also stated that "[i]t was not considered our style of doing business ... to bid against our own shareholders and people with whom we were negotiating in good faith all this while." *Id.* at 629. The fact remains, however, that nothing prevented Apace from bidding on NetSetGo's assets, which Aggarwal believed were worth far more than they sold for. *Id.* at 628. Apace's claim that it was somehow "lulled into inaction" is simply devoid of evidentiary support. Plaintiff's Response to Levines' Statement of Material Facts (Dkt. #237-1) ¶ 27.

As noted earlier, Apace had also retained and consulted counsel prior to entering into the SPA. There was nothing to prevent Apace from doing so in connection with the foreclosure sale as well. Particularly since Apace seems to have had some misgivings about the sale, such a course of action would have certainly been prudent, and may well have led Apace to do something other than simply sit back and "observe" the sale.

Apace contends that the Levines (and Cephas) falsely claimed to be NetSetGo's only secured creditors. Apace asserts that it was also a secured creditor, by virtue of the July 2, 2001 assignment to Apace of KeyBank's security interest in NetSetGo, and that its interest was superior to the Levines' interest. Plaintiff contends, with respect to the Levines' assertion that Apace never perfected that interest, *see* Levines' Mem. (Dkt. #168-6) at 3, that it was unnecessary for Apace to do so. *See* U.C.C. § 9-310(c) ("[i]f a secured party assigns a perfected security interest or agricultural lien, a filing under this article is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor").

Any such alleged misrepresentations by defendants could not have harmed plaintiff. Certainly Apace was well aware of the salient facts concerning the assignment to it of KeyBank's security interest. It could not have been misled in that regard by anything said or done by defendants. If plaintiff believed that the sale was improper, then it should have objected prior to the sale. *See Brunswick Acceptance*, 292 S.W.3d at 644; *Winer*, 39 B.R. at 509. But I see no basis upon which to transform this into a fraud claim.

In short, plaintiff's claims against the Cephas defendants and the Levines are based on unsupported, conclusory allegations. Furthermore, they are contradicted by the evidence, which shows conclusively that Aggarwal, on behalf of Apace, was either fully aware of the facts, or that he chose not to uncover the relevant facts, before he made the investment decisions in question. His buyer's remorse, at this late stage, is not a sufficient ground to allow his claims against these defendants to proceed.

**CONCLUSION**

The motions for summary judgment filed by defendants Lori and Steven Levine (Dkt. #168) and Clint Campbell, Cephas Capital Partners, LP and Jeffrey Holmes (Dkt. #173) are granted, and the claims against those defendants are dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       April 28, 2014.